UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRIS ROBINSON,<br><br>        Plaintiff,<br><br>     v.<br><br>HD SUPPLY, INC.,<br><br>        Defendant. | No.  2:12-cv-604 GEB AC<br><br><br>ORDER |

On July 17, 2013, the court held a hearing on defendant HD Supply, Inc.'s ("HDS") June 5, 2013 motion to compel an independent medical examination ("IME") of plaintiff Kris Robinson. Sean Gavin appeared for plaintiff, and Brian Inamine appeared for HDS. On review of the motion, the documents filed in support and opposition, upon hearing the arguments of counsel, and good cause appearing therefore, THE COURT FINDS AS FOLLOWS:

                      RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A.     Factual Allegations[1]

On or about March 24, 2008, HDS, an industrial distribution corporation, hired plaintiff to work as an Assistant Transportation Manager. Sec. Am. Compl. ("SAC") ¶ 8, ECF No. 30.

---

[1] These facts are reproduced from the Honorable Garland E. Burrell, Jr.'s November 1, 2012 order granting in part and denying in part defendant's motion to dismiss the second amended complaint. See Order Part. Granting Def.'s Mot. Dismiss Nov. 1, 2012, at 2-5, ECF No. 34.

1

1   Plaintiff's job duties included "scheduling truck drivers and coordinating pick-ups and deliveries
2   throughout Northern California," and "comply[ing] with state and federal laws and regulations,"
3   such as the Federal Motor Vehicle Safety Regulations. Id. ¶¶ 9-10. On January 11, 2010,
4   "[Plaintiff] informed Mary Sullivan, [HSD's] Distribution Center Manager and [Plaintiff's]
5   immediate supervisor, that he had recently been diagnosed with PTSD as a result of events that
6   occurred during his overseas service in the United States Marine Corps." Id. ¶ 11. Seven
7   working days later, Ms. Sullivan suspended Plaintiff from his job indefinitely. Id. ¶¶ 12, 20, 30.

8   On January 20, 2010, "Ms. Sullivan instructed [Plaintiff] to locate a driver who would be
9   able to make a delivery from Sacramento to Salinas on short notice. [Plaintiff] was concerned
10  about this instruction, however, because he knew that, based on the distance between these
11  locations, this delivery route would necessitate a violation of the U.S. Department of
12  Transportation Hours-of-Service Regulations." SAC ¶ 13, ECF No. 30. "[Plaintiff] shared his
13  concern with Ms. Sullivan, who refused to rescind her order. Thereafter, [Plaintiff] consulted with
14  [HDS's] Regional Transportation Manager, Bruce Gagon" and "suggested an alternative method
15  of accomplishing the delivery without violating any Department of Transportation Regulations."
16  Id. ¶ 14. "Mr. Gagon advised [Plaintiff] that if he was uncomfortable with the instruction, he
17  should ask Ms. Sullivan to issue the order herself. [Plaintiff] complied with [Mr. Gagon's]
18  direction . . . and refused to issue" the order. Id. ¶ 15. Despite Plaintiff's compliance with Mr.
19  Gagon's advice, Ms. Sullivan "harangued" Plaintiff and "told [him] that he would be disciplined
20  for insubordination if he maintained his refusal to execute the order." Id. ¶ 16.

21  Ms. Sullivan's actions caused Plaintiff "extreme stress and anxiety" and "exacerbated
22  [Plaintiff's] preexisting PTSD and [Plaintiff's] reliance on medication for his PTSD." SAC ¶ 17,
23  ECF No. 30. "Ms. Sullivan's insistence that she would discipline [Plaintiff] if he did not execute
24  an order that he knew violated State and Federal laws and regulations [] triggered the symptoms
25  of [Plaintiff's] PTSD and . . . interfered with [Plaintiff's] ability to coordinate with his
26  coworkers." Id. ¶ 28. Her threats and their interaction with Plaintiff's PTSD also "hindered
27  [Plaintiff's] ability to concentrate" and perform the "essential function" of scheduling drivers and
28  deliveries on time and in compliance with the law. Id. ¶ 27. Due to the threats, Plaintiff

2

1  "informed [HDS] that he needed to take a walk [in the warehouse] in order to calm down" and
2  that "Ms. Sullivan's threats necessitated his temporary removal from the hostile situation." Id. ¶¶
3  18-19, 22. Plaintiff was suspended indefinitely from his job later that day. Id. ¶ 12.

4  "Because of the stress the suspension caused him, [Plaintiff] visited his physician's office
5  and received a note from [the] Nurse Practitioner, Ms. Willerup, prescribing [that] he take a 10-
6  working-day leave of absence . . . 'in order to adjust to treatment for health concerns.' [Plaintiff]
7  provided this information to [HDS]." SAC ¶ 31, ECF No. 30. Plaintiff's request for this medical
8  leave immediately followed his disagreement with Ms. Sullivan. Id. ¶ 24.

9  Plaintiff also told "Mr. Gagon that Ms. Sullivan was threatening him with discipline if he
10 failed to execute the [] order." SAC ¶ 23, ECF No. 30. Mr. Gagon "knew that permitting Ms.
11 Sullivan to continue [] supervis[ing] [Plaintiff] created the risk that [Plaintiff] would suffer
12 additional injuries." Id. at ¶ 21. Nonetheless, "Ms. Sullivan continued to supervise [Plaintiff]"
13 throughout and following the January 20th incident. Id. at ¶ 23.

14 After his medical leave, Plaintiff "returned to work on February 9, 2010." SAC ¶ 33, ECF
15 No. 30. The next day, on February 10, 2010, HDS "summarily terminated [Plaintiff's]
16 employment." Id. ¶ 34. The only misconduct that HDS alleged Plaintiff committed involved the
17 January 20th incident. Id. ¶ 23. In terminating Plaintiff, "[HDS] considered Plaintiff's disability"
18 and "Plaintiff's . . . refusal to participate in a course of action that would result in a violation of
19 Federal and State laws and regulations." Id. ¶¶ 42, 43, 52.

20 As a result of the termination, plaintiff alleges that he suffered emotional distress
21 including, but not limited to, anxiety, sleeplessness, nightmares, nervousness, depression, worry,
22 loss of appetite, loss of libido, rapid weight gain, hair loss, headaches, nervous twitching, stress,
23 anger, feelings of hopelessness, feelings of isolation, embarrassment, mental anguish, indignation,
24 apprehension, and feelings of betrayal. See, e.g., SAC ¶¶ 35, 45, 54, 63, 72, 80, 87.

25 B.    Relevant Procedural History

26 Plaintiff commenced this action on January 24, 2012 in the Sacramento County Superior
27 Court against defendant-employer HDS. Notice of Removal ¶ 1, ECF No. 1. This matter was
28 removed to this court on March 8, 2012 and is proceeding on a SAC filed September 20, 2012.

1  Following Judge Burrell's order partially granting defendant's motion to dismiss the SAC, four
2  claims now remain: wrongful termination, disability discrimination, failure to provide reasonable
3  accommodations, and retaliation.
4        On July 2, 2012, Judge Burrell issued a pretrial scheduling order setting forth dates in this
5  matter.  Expert disclosures were to be finalized by March 15, 2013, and discovery is to conclude
6  on July 21, 2013.  ECF No. 17 at 2.
7        On February 15, 2013, plaintiff identified four non-retained experts by name, address, and
8  telephone number: Elizabeth Willerup, NP; Cherie Coddington, CSW; Brian Dahmen, Ph.D.; and
9  Kim Fuller, Ph.D.[2]  Gavin Decl. Ex. A, ECF No. 57-2.  Plaintiff did not provide the subject
10  matter to which these individuals were expected to testify or a summary of their opinions.
11        Also on February 15, 2013, defendant served its initial expert disclosure list stating that
12  "HDS does not designate any experts at this time.  HDS reserves its rights pursuant to FRCP
13  26(a)(2)(B)&(C) to serve a supplemental and/or rebuttal expert designation."  Pl.'s Mot. to
14  Exclude Ex. A, ECF No. 55-1.
15        On March 15, 2013, defendant served its rebuttal expert disclosure list identifying a single
16  expert, Dr. Alan Brooker, a neuropsychologist.  Pl.'s Mot. Exclude Ex. B, ECF No. 55-2.
17        Though the scheduling order is silent on the issue of supplemental expert disclosures,
18  plaintiff filed a supplemental expert witness list on May 10, 2013 identifying two more experts
19  and stating, as to all now-five expert witnesses, that each was "Plaintiff's medical provider and
20  has knowledge as to Plaintiff's medical diagnosis and/or treatment."  HDS Opp'n to Pl.'s Mot.
21  Exclude Bonoli Decl. Ex. L, ECF No. 57-3 at 111-13.  On May 10, 2013, Plaintiff identified two
22  additional expert witnesses.
23        Following plaintiff's initial expert disclosure report, HDS attempted to depose all of the
24  experts, but faced considerable trouble from their employer, the Veteran's Administration
25  ("VA"), which refused to produce them.  After four months of meet and confer efforts and
26  defendant's filing of a motion to compel and a related motion in limine, the VA ultimately
27
28  [2] Kim Fuller was later withdrawn from the list of expert witnesses.

1    produced the witnesses with limitations as to deposition time (Ms. Coddington for 0.5 hours, Mr.
2    Dahmen for 1.5 hours, and Ms. Willerup for 2 hours) and scope of testimony (only that which is
3    provided in the medical record).  These depositions occurred in June 2013.
4          On June 5, 2013, HDS filed the instant motion to compel an IME of plaintiff by Dr.
5    Brooker.[3]  Def.'s Mot. Compel IME, ECF No. 48.  HDS contends that an IME of plaintiff is
6    necessary because plaintiff alleges that he suffered mental injury as a result of HDS's alleged
7    wrongful conduct, and an examination by Dr. Brooker, a clinical neuro-psychologist, is necessary
8    in order to properly evaluate the extent of plaintiff's claimed injuries.  Def.'s Mot. Compel IME
9    2, ECF No. 48.
10         Plaintiff opposes this motion on the grounds that his mental condition is not in
11   controversy and that there does not exist good cause to conduct the IME.  To the extent the court
12   is inclined to grant defendant's motion to conduct an IME, plaintiff asks the court to bar Dr.
13   Brooker from conducting it.

## LEGAL STANDARDS

15   Rule 35 of the Federal Rules of Civil Procedure allows a court, on a motion for good
16   cause, to order a mental examination by a suitably licensed or certified examiner of a party whose
17   mental condition is "in controversy."  Fed. R. Civ. P. 35(a); Schlagenhauf v. Holder, 379 U.S.
18   104, 118 (1964).  The requirements "are not met by mere conclusory allegations of the pleadings
19   – nor by mere relevance to the case – but require an affirmative showing by the movant that each
20   condition as to which the examination is sought is really and genuinely in controversy and that
21   good cause exists for ordering each particular examination."  Schlagenhauf, 379 U.S. at 118.
22         To establish that a mental condition is "in controversy," the moving party should
23   demonstrate one or more of the following factors:

> (1) a cause of action for intentional or negligent infliction of emotional distress;
>
> (2) an allegation of a specific mental or psychiatric injury or

---

[3] Also pending before the undersigned is plaintiff's June 19, 2013 motion to exclude Dr. Brooker as a rebuttal witness.  Pl.'s Mot. Exclude Def.'s Rebuttal Witness, ECF No. 55.  That motion will be addressed by separate order.

5

disorder;

(3) a claim of unusually severe emotional distress;

(4) plaintiff's offer of expert testimony to support a claim of emotional distress; and/or

(5) plaintiff's concession that his or her mental condition is "in controversy" within the meaning of Rule 35(a).

Turner v. Imperial Stores, 161 F.R.D. 89, 95 (S.D. Cal. 1995).[4]

Basic, garden-variety claims of emotional distress do not warrant an IME. Sabree v. United Bhd. of Carpenters & Joiners, 126 F.R.D. 422, 426 (D. Mass.1989). However, a medical examination is generally allowed if there are specific facts demonstrating that a party's emotional state will be at issue. Lowe v. Philadelphia Newspapers, Inc., 101 F.R.D. 296s, 298 (E.D. Pa. 1983) (where plaintiff seeks to prove emotional distress and harm through her own testimony and that of psychiatrists, defendant has a right to make a searching inquiry).

## DISCUSSION

To succeed on its motion to conduct an IME, defendant must show that plaintiff's mental condition is in controversy and that there exists good cause for the IME.

A.   The "In Controversy" Requirement

Defendant argues that plaintiff's mental condition is in controversy in two separate contexts: (1) in relation to plaintiff's allegation that HDS's conduct prior to his termination exacerbated plaintiff's pre-existing PTSD, and (2) in relation to the allegation that HDS's decision to terminate plaintiff's employment caused plaintiff emotional distress. In opposition, plaintiff argues that his PTSD is not in controversy and that the emotional distress he alleges is merely garden variety.

1. PTSD

Defendant argues that the second Turner factor is satisfied because plaintiff accuses defendant of exacerbating his pre-existing PTSD, a "specific mental or psychiatric injury or

---

[4] While Turner is the majority view of district courts, some courts will grant a Rule 35 independent medical examination whenever a plaintiff seeks compensatory damages for the emotional pain they claim to have suffered as a result of a defendant's actions. See e.g., Nuskey v. Lambright, 251 F.R.D. 3, 6-7 (D.C.C. 2008).

1 disorder." Defendant refers to plaintiff's allegations that Ms. Sullivan's conduct caused plaintiff
2 "extreme stress and anxiety" that "hindered his ability to concentrate" causing an "exacerbat[ion
3 of] plaintiff's pre-existing PTSD and plaintiff's reliance on medication for his PTSD." Further as
4 a result of Ms. Sullivan's conduct, plaintiff was forced to "temporar[ily] remov[e] himself from
5 the hostile situation," and later to take a 10-day leave of absence.

6 Plaintiff counters that the fact that he suffered from PTSD before he was hired by HDS as
7 well as during the period of his employment is not disputed. Insofar as defendant submits that the
8 PTSD is in controversy because plaintiff claims HDS's conduct exacerbated the PTSD, plaintiff
9 asserts that this exacerbation is irrelevant to his claims. Plaintiff's point is well-taken. Defendant
10 has not shown how the exacerbation of plaintiff's PTSD – as opposed to the mere fact that
11 plaintiff had PTSD – is relevant to any plaintiff's claims (wrongful termination, disability
12 discrimination, failure to provide reasonable accommodations, and retaliation). Furthermore,
13 none of the remaining Turner factors are applicable to plaintiff's PTSD. Turner's first and fifth
14 factors clearly do not apply because plaintiff does not have a cause of action for intentional or
15 negligent infliction of emotional distress and because he has not conceded that his PTSD is in
16 controversy. As to those Turner factors that address emotional distress, they will be discussed
17 infra. Accordingly, the court finds that plaintiff's PTSD is not in controversy.

18     2. Emotional Distress

19 Although Rule 35 "is to be construed liberally in favor of granting discovery," "garden-
20 variety" emotional distress is insufficient to put plaintiff's mental state in controversy. Turner,
21 161 F.R.D. at 96; see also Schlagenhauf, 379 U.S. at 118. "One district court has characterized
22 garden-variety claims for emotional distress as 'claims of generalized insult, hurt feelings, and
23 lingering resentment' that 'do not involve a significant disruption of the plaintiff's work life and
24 rarely involve more than a temporary disruption of the claimant's personal life.'" Ortiz v. Potter,
25 2010 WL 796960, at *3 (E.D. Cal. Mar. 5, 2010) (quoting Javeed v. Covenant Medical Center
26 Inc., 218 F.R.D. 178, 179 (N.D. Iowa, Apr. 3, 2001). Another district court distinguished a
27 garden-variety claim of emotional distress from "a claim of psychic injury or psychiatric
28 disorder." Houghton v. M & F Fishing, Inc., 198 F.R.D. 666, 668 (S.D. Cal. Jan. 10, 2001)

1  (quoting Sabree v. United Broth. of Carpenters & Joinders of America, Local No. 33, 126 F.R.D.
2  422, 426 (D. Mass. June 8, 1989).

3  In this case, plaintiff has alleged the following symptoms of emotional distress as a result
4  of his termination: anxiety, sleeplessness, nightmares, nervousness, depression, worry, loss of
5  appetite, loss of libido, rapid weight gain, hair loss, headaches, nervous twitching, stress, anger,
6  feelings of hopelessness, feelings of isolation, embarrassment, mental anguish, indignation,
7  apprehension, and feelings of betrayal.

8  While "there is no doubt that the ordinary person would suffer temporary distress if he
9  were unlawfully terminated from employment he otherwise desired to retain," Rund v. Charter
10 Communications, Inc., 2007 WL 312037, at *2 (E.D. Cal. Jan. 30, 2007), plaintiff's emotional
11 distress in this case surpasses garden-variety and appears unusually severe. See Ortiz, 2010 WL
12 796960, at *4 (in a wrongful termination and disability discrimination case, the court found that
13 plaintiff's emotional distress was unusually severe where she experienced damage to her teeth
14 due to clenching of her jaw, depression, anxiety, high blood pressure, migraine headaches, chest
15 pains, trouble sleeping, crying spells, and feelings of humiliation, degradation, powerlessness,
16 helplessness, frustration, anger, depression and anxiety); Simon v. Bellsouth Adver. & Publ'g
17 Corp., 2010 WL 1418322, at *3 (W.D.N.C. Apr. 1, 2010) (in a wrongful termination case, the
18 court found that an emotional distress claim that resulted in physical manifestations can be fairly
19 categorized as unusually severe emotional distress under Turner); Schaadt v. St. Jude Med. S.C.,
20 Inc., 2006 WL 7090866, at *3 (D. Minn. Apr. 4, 2006) (in a gender discrimination and breach of
21 contract case, the court found that plaintiff had unusually severe emotional distress by specifying
22 injuries such as weight loss, difficulty sleeping, frequent nightmares, acne, fatigue, feeling or
23 worthlessness, loss of self-confidence, social withdrawal, and loss of hope).  The court therefore
24 finds that plaintiff's mental condition is in controversy in relation to emotional distress.  That
25 does not end the inquiry, however.

26 B.      The Good Cause Requirement

27 The court now turns to the question whether defendant has shown good cause to conduct
28 the IME.  To establish "good cause," the moving party generally must offer specific facts

1    showing the examination is necessary and relevant to the case.  See Gavin v. Hilton Worldwide,
2    Inc., 2013 WL 1402350, at *3 (N.D. Cal. Apr. 5, 2013); Raggae v. MCA / Universal Studios, 165
3    F.R.D. 605, 609 (C.D. Cal. 1995).  Factors considered in assessing whether "good cause" exists
4    include, but are not limited to: (1) "the possibility of obtaining desired information by other
5    means;" (2) "whether plaintiff plans to prove her claim through testimony of expert witnesses;"
6    (3) "whether the desired materials are relevant;" and (4) "whether plaintiff is claiming ongoing
7    emotional distress."  Juarez, at *1 (quoting Impey v. Office Depot, Inc., 2010 2985071, at *21
8    (N.D. Cal. July 27, 2010).

9        Regardless of whether the "good cause" requirement is met, it is within the court's
10   discretion to determine whether to order an examination.  See Williams v. Troehler, 2010 WL
11   121104, at *4 (E.D. Cal. Jan. 7, 2010) ("even if good cause is shown, it is still within the court's
12   discretion to determine whether to order an examination."); Kob v. County of Marin, 2009 WL
13   3706820, at *3 (N.D. Cal. Nov. 3, 2009) (since the defendant failed to show good cause, "it
14   remained within the court's discretion whether to grant the Rule 35(a) order."); Hodges v. Keane,
15   145 F.R.D. 332, 334 (S.D.N.Y. Jan. 6, 1993) (since defendant does not allege ongoing suffering,
16   "a Rule 35(a) order lies soundly within the court's discretion.").

17       The court finds that HDS has not demonstrated good cause to conduct an IME.  HDS
18   contends that good cause exists because: (1) one of plaintiff's three experts, Ms. Coddington, did
19   not have any knowledge of plaintiff's PTSD; (2) HDS could not finish the deposition of
20   plaintiff's other expert, Mr. Dahmen, before the time limit imposed by the VA; (3) plaintiff
21   identified two new experts on May 10, 2013 and has not yet produced them for deposition; (4)
22   HDS has been unable to view plaintiff's full medical file because plaintiff's complete medical
23   bills were not included; and (5) plaintiff has not agreed to an IME.  For these reasons, HDS
24   argues that it is unable to discover relevant information pertaining to plaintiff's treatment and
25   medical condition.

26       HDS's asserted bases for good cause are unpersuasive.  Initially, that Ms. Coddington was
27   unable inability to testify to Plaintiff's PTSD does not trigger a need for an IME.  Additionally,
28   while Mr. Dahmen's deposition was limited in time, HDS claimed that they needed only an

9

additional twenty to thirty minutes.  As plaintiff convincingly argues, "an additional 20-30 minutes of deposition is not fungible for an entire mental examination, especially where [HDS] has made no showing that the additional 20-30 minutes would have focused on plaintiff's 'claimed mental and emotional injuries.'"  As plaintiff also argues, HDS has not attempted to depose plaintiff's two supplemental experts who were disclosed on May 10, 2013, before any other experts' depositions were scheduled.  Moreover, defendant has not shown how or why the lack of medical bills would have any bearing on the need for an IME.  Finally, to the extent plaintiff intends to submit expert testimony on the question of either his PTSD and/or emotional distress, the VA has expressly limited that testimony to information contained in the medical record, which HDS has in its possession.

Accordingly, IT IS HEREBY ORDERED that defendant's June 5, 2013 motion to compel an IME of plaintiff (ECF No. 48) is denied.

DATED: July 19, 2013

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

/mb;robi0604.disc.ime